**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

KRISTA JACKSON,

                    Plaintiff,

vs.                                         Case No. 3:11-cv-63-J-JRK

MICHAEL J. ASTRUE,
Commissioner of the Social Security
Administration,

                    Defendant.

_____/

## OPINION AND ORDER[1]

### I. Status

     Krista Jackson ("Plaintiff") is appealing the Commissioner of the Social Security

Administration's ("Administration('s)") final decision denying her request for wavier of an

overpayment of disability insurance benefits. Generally, the Social Security Act ("the Act")

requires that when a social security beneficiary has been overpaid, the Administration must

recoup the overpaid benefits. 42 U.S.C. § 404(a)(1)(A)[2]; see also 20 C.F.R. § 404.501(a).

---

     [1]      The parties consented to the exercise of jurisdiction by a United States Magistrate Judge. See Consent to the Exercise of Jurisdiction by a United States Magistrate Judge (Doc. No. 10), filed June 2, 2011; Order of Reference (Doc. No. 11), entered June 9, 2011.

     [2]      Section 404(a)(1)(A) provides in relevant part:

     With respect to payment to a person of more than the correct amount, the Commissioner of Social Security shall decrease any payment under this subchapter to which such overpaid person is entitled, or shall require such person or his estate to refund the amount in excess of the correct amount, or shall decrease any payment under this subchapter payable to his estate or to any other person on the basis of the wages and self-employment income which were the basis of the payments to such overpaid person, or shall obtain recovery by means of reduction in tax refunds based on notice to the Secretary of the Treasury as permitted under section 3720A of Title 31, or shall apply any combination of the foregoing.

                                                                  *(continued...)*

In certain situations, however, the Act directs the Administration to waive recoupment of an overpayment:

> In any case in which more than the correct amount of payment has been made, there shall be no adjustment of payments to, or recovery by the United States from, any person who is without fault if such adjustment or recovery would defeat the purpose of this subchapter or would be against equity and good conscience.

42 U.S.C. § 404(b); see also 20 C.F.R. § 404.506(a).  Thus, the Act and the Regulations establish a two-prong test to determine whether a waiver of recoupment of overpayment is appropriate.  First, it must be determined whether the overpaid beneficiary was at fault in connection with the overpayment; and second, it must be determined whether recovery of the overpayment would defeat the purpose of title II of the Act or be against equity and good conscience.  See 42 U.S.C. § 404(b); 20 C.F.R. § 404.506(a).  At the administrative level, a claimant bears the burden of showing he or she is eligible for a waiver of collection of overpayment.  See, e.g., 20 C.F.R. § 404.506(c) (providing that the individual seeking waiver of collection of overpayment "gives SSA information to support his/her contention that he/she is without fault in causing the overpayment. . . and that adjustment or recovery would either defeat the purpose of title II of the Act . . . or be against equity and good conscience. . ."); Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1042 (2d Cir. 1984) (citations omitted).

Here, the Administration ultimately found that Plaintiff was not at fault in causing the overpayment; accordingly, Plaintiff satisfied the first prong of the test.  The Administration

---

[2](...continued)
42 U.S.C. § 404(a)(1)(A) (emphasis added).

found against Plaintiff on the second prong of the test.  Only the Administration's decision regarding the second prong of the test is at issue in this appeal.

## II.  Background/Facts

On October 15, 1991, Plaintiff applied for disability insurance benefits because of blindness.  Transcript of Administrative Proceedings (Doc. No. 6; "Tr.") at 13.  Plaintiff was awarded disability insurance benefits beginning in 1992.  Tr. at 14, 184.  It appears that Plaintiff received uninterrupted monthly benefits until she was notified by the Administration on about April 8, 2005 ("April 2005 Notice") that the Administration had determined Plaintiff likely should not have received payments beginning in April 2004.  Tr. at 139-42.  In the April 2005 Notice, Plaintiff was given an explanation regarding the Administration's determination that she likely should not have received benefits beginning in April 2004.  Tr. at 139-42.  Plaintiff was advised that Administration records showed she had used her nine-month trial work period[3] from October 1996 through June 1997, and that beginning in December 2003 and continuing through the date of the April 2005 Notice, she was working for the Duval County School Board.  Tr. at 139-40.  According to the April 2005 notice, Plaintiff started performing substantial gainful activity and thus was not disabled beginning in January 2004.  Tr. at 140.  Consistent with its practice, the Administration automatically added two months of benefits after the month in which Plaintiff allegedly became disabled, so Plaintiff was still eligible for benefits until March 2004.  Tr. at 140.  Plaintiff was permitted

_____

[3]       The Regulations provide for a "trial work period," during which a claimant "may test [his or her] ability to work and still be considered disabled."  20 C.F.R. § 404.1592(a).  The claimant is allowed to "perform services . . . in as many as 9 months, but these months do not have to be consecutive."  Id.

an opportunity to respond to the April 2005 Notice within ten (10) days of receiving it. Tr. at 141.

Plaintiff responded via letter dated April 22, 2005. Tr. at 143-44. Plaintiff explained in the letter why she believed that the Administration had incorrect information regarding the likely decision to stop her benefit payments. Tr. at 143-44 (incorporating by reference letter of March 14, 2005 at Tr. at 145-46). In sum, Plaintiff indicated that as to the 1996 through 1997 work period, she understood her earnings from her work during that time to be under the allowable cap,[4] Tr. at 143, and therefore, the work she performed during that time should not have been considered "trial work," see Tr. at 140. As to the work for the Duval County School Board beginning in 2003, Plaintiff clarified that at some point, she contacted the Administration to report she was working again, and she was told she "could work for a period of 9 months and earn a monthly salary without impact on [her] Social Security benefits[.]" Tr. at 143. Plaintiff clarified that, contrary to the Administration's records, she worked a nine-month trial period from December 2003 through May 2004 (five months) and from August 2004 through December 2004 (four months). Tr. at 144. Plaintiff then recognized her benefits should have been terminated in March 2005, two months after her trial work period ended in January 2005. Tr. at 144.

The Administration did not take any action regarding Plaintiff's benefits, and it apparently did not contact Plaintiff until November 4, 2005, when it sent Plaintiff a notice stating that Plaintiff's benefits were actually being increased ("November 2005 Notice"). Tr.

---

[4]     The undersigned assumes Plaintiff was referring to the maximum amount she could earn monthly without being deemed to be performing substantial gainful activity, which was $960 in 1996 and $1,000 in 1997. See 20 C.F.R. § 404.1584(d)(3) (Evaluation of work activity of blind people).

at 27.  Plaintiff was notified on that date that her benefits were being increased "to give [her] credit for [her] earnings in 2004 which were not included when [the Administration] figured [her] benefit before."  Tr. at 27.  The November 2005 Notice is silent on the issue of whether Plaintiff's benefits should have been terminated as contemplated in the April 2005 Notice. Tr. at 27-28.

Plaintiff received a lump sum payment of $6,043.00 to account for her new monthly payment for November 2005, plus the difference between what she was actually paid and what she should have been paid for January 2005 through October 2005.  Tr. at 27. Thereafter, Plaintiff was to be paid an increased monthly benefit.  Tr. at 27.  Then, in a notice dated July 1, 2006, Plaintiff was informed that her disability insurance benefits were suspended effective June 2006 based on "information regarding [Plaintiff's] work and earnings[.]"  Tr. at 29-31.  Almost a year later, in notices dated April 16, 2007 (collectively, "April 2007 Notices"), Plaintiff was informed that prior to the cessation of her benefits, she and her dependant children had been overpaid a total of $39,558.70, which included $26,496.70 to her and $6,531.00 to each of her two children.  Tr. at 34-37, 38-41.[5] According to the April 2007 notices, Plaintiff became "no longer disabled" in January 2004, and her and her children's benefits should have been terminated in April 2004.  Tr. at 34, 38.  Plaintiff was instructed to refund the overpayment within 30 days if able, and she was also informed of her right to appeal the decision and/or to request a waiver.  Tr. at 35, 38-39.

---

[5]     The notice pertaining to one of Plaintiff's children does not appear in the record.

On May 14, 2007, Plaintiff filed a Request for Waiver of Overpayment ("Request for Waiver"). Tr. at 42-50. In the Request for Waiver, Plaintiff checked a box indicating that "[t]he overpayment was not [her] fault and [she could not] afford to pay the money back and/or it is unfair for some other reasons." Tr. at 43. Plaintiff also provided her then-current financial information as requested. Tr. at 45-49. As far as assets, Plaintiff reported having $6,000.00 in a savings account, $7,700.00 in an individual retirement account, $18,000.00 in "money or mutual funds," and $40,000.00 in a checking account. Tr. at 46 (capitalization omitted). Plaintiff also reported a pending sale of a boat worth about $7,000.00. Tr. at 46. As far as income, Plaintiff reported a monthly take-home pay of $2,160.00 from the Duval County School Board and survivors benefits paid to her children in the amount of $1,980.00 per month. Tr. at 47. The grand total of monthly income (including $316.00 per month of "income from assets") was reported as $4,456.00. Tr. at 47. Plaintiff reported, however, that she does not have any monthly income from the end of May through the beginning of September. Tr. at 49. As far as expenses, Plaintiff reported $4,276.00 per month. Tr. at 48.[6]

Plaintiff and her counsel attended a personal conference with a representative of the Administration on April 3, 2008. Memorandum in Support of Plaintiff's Appeal of the Commissioner's Decision (Doc. No. 8; "Pl.'s Mem.") at 5. Following the conference, on April 9, 2008, the representative decided that Plaintiff was at fault in causing the overpayment,

---

[6]    After an automatic additional $25 adjustment, the adjusted monthly expenses totaled $4301.00. Tr. at 49.

and that the overpayment should not be waived.  Tr. at 91-92, 93.  On April 13, 2008,

Plaintiff filed a timely Request for Hearing by Administrative Law Judge ("ALJ").  Tr. at 94.

On September 11, 2008, a hearing was held before an ALJ.  Tr. at 181-208.  Plaintiff

did not contest the existence of an overpayment in the amount of $38,358.70 (the original

figure of $39,558.70 reduced by $1,200.00, the amount of an economic stimulus check

issued by the Internal Revenue Service that was garnished by the Administration to pay

towards the debt).  Tr. at 183, 179.[7]  Rather, she argued she qualified for a waiver.  Tr. at

184-87.

During the hearing, Plaintiff testified that she started collecting disability benefits in

1992.  Tr. at 187.  While collecting the benefits, Plaintiff worked some in Germany for the

American Embassy Day Care for eight months from October 1996 through May 1997, and

at the time, she informed the Administration that she was working.  Tr. at 187-88.  Plaintiff

stated she was told that she had a nine-month trial period during which she could work

without interruption to her benefits, after which her case would be reviewed to determine

whether the benefits should be adjusted.  Tr. at 188.  Therefore, Plaintiff collected benefits

while she was working for the American Embassy Day Care.  Tr. at 189.

Plaintiff eventually moved back to the United States and earned her "teaching

degree."  Tr. at 189.  In 2003, she began to work as a school teacher for the Duval County

School Board.  Tr. at 189.  She now teaches third grade, Tr. at 189, but it is unclear from

the record whether she has always taught third grade.  Plaintiff testified that when she

---

[7]     During the hearing, the ALJ indicated the stimulus check was in the amount of $1,600.00, Tr. at 183, but the record reflects it was actually in the amount of $1,200.00, Tr. at 179.

returned to work in 2003, she contacted the Administration via telephone and asked about whether she was entitled to another nine-month trial work period. Tr. at 189, 190. According to Plaintiff, she was told by a representative of the Administration that she was entitled to another nine-month trial work period because more than five years had passed since her last trial work period. Tr. at 189. Plaintiff worked from December 2003 through May of 2004, and then took a couple of months off (presumably for summer break). Tr. at 189-90. Plaintiff called the Administration again at the end of May to inquire about her trial period status, and she was told that the summer months off would not count because she was entitled to "nine months of working." Tr. at 190. According to Plaintiff's calculations, her trial period picked up again in August 2004 when the school year started, and it ultimately expired in December of 2004, which was the end of nine months of actual work. Tr. at 190.

Plaintiff testified that in December of 2004, she again contacted the Administration to inquire about the status of her benefits. Tr. at 190. At that point, she was told "they were reviewing the case, that [she] was still entitled to benefits until they let [her] know otherwise." Tr. at 190. Plaintiff continued receiving disability benefit checks until 2006, when she was notified of the overpayment. Tr. at 192.

Plaintiff testified as follows regarding the sale of the boat she reported as pending on her Request for Waiver. She received $6,000.00 in proceeds from the sale of the boat, but the money was ultimately stolen from her house. Tr. at 194. Plaintiff filled out a police report when the money was stolen. Tr. at 194.

Plaintiff also testified generally about changes in her financial situation since the Request for Waiver had been filed. Tr. at 192-207. Plaintiff takes money out of savings every month to cover the deficit in her monthly income and to cover the summer months when she is not receiving a check from her employer. Tr. at 198-99. In addition, Plaintiff stated that beginning in July 2009, her son's benefits would stop, which would result in a loss of income each month. Tr. at 199. Also, Plaintiff confirmed there existed the possibility that Plaintiff would be "picking up some benefits as a surviving parent[.]" Tr. at 199. Plaintiff indicated that if she were to have to pay back a lump sum of approximately $36,000.00, she would not be able to survive in the summer. Tr. at 199-200.

The ALJ permitted Plaintiff following the hearing to submit written updated financial information confirming and documenting the financial changes about which she testified, as well as the police report and documentation of the garnished stimulus check, Tr. at 183, 208, which Plaintiff did, Tr. at 149-80. In the updated Financial Statement submitted on October 16, 2008 ("October 2008 Statement") and reflecting the changes about which Plaintiff testified at the hearing, Plaintiff reported a total of $30,627.07 in "readily available" assets. Tr. at 152. For assets in general, Plaintiff reported just more than $2,000.00 in savings, $5,200.00 in an individual retirement account, $18,904.00 in "money or mutual funds," and a total of $28,609.00 in checking accounts. Tr. at 152. As far as monthly income, Plaintiff reported $2,800.00 in take home pay from the School Board and $1,658.00 in monthly social security benefits for her children, for a total of $4,458.00. Tr. at 153. For monthly expenses, Plaintiff reported a total of $4,822.84. Tr. at 154. Plaintiff further reported, consistent with her testimony at the hearing, that beginning in July 2009 her son's

benefits would stop, resulting in a loss of $829.00 per month. Tr. at 155. Plaintiff also reported that "[a]ll monies are being held to meet ordinary and necessary living expenses in the months [she] do[es] not receive a paycheck[.]" Tr. at 155.

### III. ALJ's Decision/ Appeals Council Ruling

On February 9, 2009, the ALJ issued a written Decision in which he found Plaintiff ineligible for a waiver of overpayment. Tr. at 13-15. With regard to whether Plaintiff was at fault for the overpayment, the ALJ found she was not. Tr. at 14. However, after commenting on the record evidence, including Plaintiff's financial resources and expenses, the ALJ determined that Plaintiff "has the ability to repay the overpayment on an installment basis." Tr. at 14-15. Accordingly, the ALJ concluded that "recovery of the overpayment is not waived as it would not defeat the purpose of the Social Security Act or be against equity and good conscience as set forth in 20 CFR Sections 404.501 through 404.512." Tr. at 15.

Plaintiff timely filed a Request for Review of Hearing Decision/Order on March 26, 2009. Tr. at 8. On November 23, 2010, the Appeals Council denied Plaintiff's request for review, Tr. at 3, making the ALJ's Decision the final decision of the Commissioner. Plaintiff now appeals the final decision.

### IV.  Standard of Review

This Court reviews the Commissioner's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Although no deference is given to the ALJ's conclusions of law, findings of fact "are conclusive if . . . supported by 'substantial evidence' . . . ." Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998)); see also Coulston v. Apfel, 224 F.3d 897, 901-02 (8th Cir. 2000) (Bye, J.,

concurring) (in a case in which the plaintiff's fault in causing a payment of benefits was at issue, noting that when reviewing the Commissioner's final decision, "we are not concerned with whether [the plaintiff] met his burden of proving to the Commissioner that he was not at fault [for overpayment]" and instead the sole concern is whether the decision regarding waiver is supported by substantial evidence). "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'" Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987)). The substantial evidence standard is met when there is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Falge, 150 F.3d at 1322 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). It is not for this Court to reweigh the evidence; rather, the entire record is reviewed to determine whether "the decision reached is reasonable and supported by substantial evidence." Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991) (internal quotation and citations omitted); see also McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). The decision reached by the Commissioner must be affirmed if it is supported by substantial evidence–even if the evidence preponderates against the Commissioner's findings. Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158-59 (11th Cir. 2004) (per curiam).

## V.  Discussion

It was Plaintiff's burden at the administrative level to show either that recovery of the overpayment would defeat the purpose of title II of the Act, or that it would be against equity

and good conscience.  See 42 U.S.C. § 404(b); 20 C.F.R. § 404.506(a).  The ALJ found against Plaintiff as to both.  Tr. at 15.  Each of the ALJ's findings is discussed in turn.

## A. Whether Recovery of Overpayment Would Defeat the Purpose of Title II of the Act

To "defeat the purpose of title II" has been defined by the Regulations to mean, "to deprive a person of income required for ordinary and necessary living expenses.  This depends upon whether the person has an income or financial resources sufficient for more than ordinary and necessary needs, or is dependent upon all of his current benefits for such needs."  20 C.F.R. § 404.508(a); see also Erickson v. Comm'r of Soc. Sec., 431 F. App'x 809, 812 (11th Cir. 2011) (unpublished) (citation omitted).  In making the determination of whether the purpose of title II would be defeated, an ALJ may consider all of an individual's financial resources, in addition to the individual's income.  Valley v. Comm'r of Soc. Sec., 427 F.3d 388, 391 (6th Cir. 2005); Milton v. Harris, 616 F.2d 968, 974 (7th Cir. 1980).  The Regulations provide what is included in "ordinary and necessary expenses":

> (1) Fixed living expenses, such as food and clothing, rent, mortgage payments, utilities, maintenance, insurance (e.g., life, accident, and health insurance including premiums for supplementary medical benefits under title XVIII), taxes, installment payments, etc.;
> (2) Medical, hospitalization, and other similar expenses;
> (3) Expenses for the support of others for whom the individual is legally responsible; and
> (4) Other miscellaneous expenses which may reasonably be considered as part of the individual's standard of living.

20 C.F.R. § 404.508(a).

Plaintiff argues the ALJ erred in determining that recovery of the overpayment would not defeat the purpose of the Act because "the reasoning of the ALJ fails to constitute the necessary substantial evidence to support his finding. . ."  Pl.'s Mem. at 11.  Plaintiff also

points out that neither the Act nor the Regulations allow the ALJ to consider whether a claimant can pay over time or on an installment basis when deciding whether to allow a waiver in the first place. Id. at 13. According to Plaintiff, it was impermissible for the ALJ to do so here. Id. at 13-14. Plaintiff recognizes, however, that once a waiver is not allowed, the Administration's Program Operations Manual System ("POMS") permits collection of overpayment on an installment basis. Id. at 15. Plaintiff asks the Court to determine that recovery would in fact defeat the purpose of title II of the Act and to find that she is entitled to a waiver. Id. Alternatively, Plaintiff seeks reversal and remand for the ALJ to properly consider whether she is entitled to a waiver. Id. at 15-16.

Defendant contends that substantial evidence supports the ALJ's finding that recovery of the overpayment would not defeat the purpose of title II of the Act. Memorandum in Support of the Commissioner's Decision (Doc. No. 13; "Deft.'s Mem.") at 8-13. Defendant points out that Plaintiff did not cite to any authority stating it is impermissible for an ALJ to consider whether a claimant can pay on an installment basis, and Defendant cites three unpublished district court cases in which courts have either implicitly or explicitly found it permissible to do so. Id. at 10-12 (citations omitted). In addition, Defendant reiterates that the POMS allows recovery on an installment basis "if the debtor is 'financially unable' to make a full refund in a single payment." Id. at 11 (citing POMS GN 02210.180(A)).

In determining whether recovery of the overpayment would defeat the purpose of title II of the Act, the ALJ first summarized the record evidence on the issue:

It was stated that the claimant's financial situation was dire but that her savings totaled $20,000. But it was noted that a financial form filled out in 2007

indicated savings of $40,000; an IRA of $9,700; and a Money Market of $1,800. It was also noted that their boat was sold for $6,000. The claimant alleged that the money for the boat was stolen and provided a police report to that effect. The claimant continues to work for the school system and stated that she gets paid from August to May. She reported that she needed to take her car payment out of checking $550 monthly and reported that her monthly expenses were $4,800 and that she takes out $500 from savings for the summer months. She stated that she got a $1,500 tax refund for 2008. The claimant also reported that she has her life insurance taken out of her paycheck. She noted that she lived in a house with a mortgage payment of $1,500 and that her utilities were about $510 and that cable TV and wireless internet were $300 monthly. She reported that her children's insurance was $480 annually. She testified that maintenance for their car was $200 a month and that the payments of $860 a month included the car payment, noting that the automobile was a 2005 model and that payments would continue for another 2 years.

Tr. at 14. Next, the ALJ articulated the following reasons to support his finding that recovery would not defeat the purpose of title II of the Act:

> The claimant has approximately $20,000 in savings. Additionally, her $4,458 monthly earnings are substantially above average and she should be able to afford repayment over time. It is suggested that the claimant get a more affordable cell phone plan than their current $230 monthly plan and possibly reduce the amount of channels they receive to lower their $300 monthly cable bill. Accordingly, the [ALJ] finds that the claimant has the ability to repay the overpayment on an installment basis.

Tr. at 15.

Upon review of the ALJ's Decision and the record evidence, remand for further consideration is required because the ALJ's explanation is insufficient regarding whether Plaintiff would be deprived of ordinary and necessary expenses if she were required to pay back the overpayment, an inquiry critical to determine whether recovery would defeat the purpose of title II of the Act.

The proper inquiry is whether "the person from whom recovery is sought needs substantially all of his current income (including security monthly benefits) to meet current

ordinary and necessary living expenses." 20 C.F.R. § 404.508(b). In addition, an ALJ may consider other financial resources. Valley, 427 F.3d at 391; Milton, 616 F.2d at 974. Although the ALJ did summarize in the recitation of the facts that Plaintiff's monthly expenditures total $4,800 and that she takes money out of savings each month to pay her car payment and in the summer months to cover the deficit in her income, the ALJ did not refer at all to Plaintiff's total monthly expenses (which are more than Plaintiff's monthly income) when reasoning that she could afford repayment over time. Nor did the ALJ make any finding regarding whether Plaintiff needs substantially all of her current income to meet current ordinary and necessary living expenses. The ALJ did suggest that Plaintiff get a more affordable cellular phone plan and cable plan, but he did not make any findings regarding whether these (or any other expenses) were "ordinary and necessary."

The undersigned recognizes that the ALJ noted Plaintiff has about $20,000 in savings, Tr. at 15, and presumably the ALJ considered this information in regard to Plaintiff's ability to repay the debt. However, the most recent October 2008 Financial Statement, which the ALJ permitted Plaintiff to submit prior to rendering the Decision, reflects just more than $2,000 in savings, not $20,000 (although Plaintiff reports a total of $30,627.07 in "readily available" assets). Tr. at 152. Additionally, in reciting the reasons for finding that recovery would not defeat the purpose of title II of the Act, the ALJ did not refer at all to Plaintiff's testimony (which he apparently accepted because he did not discredit it[8]) that she takes money out of savings each month to cover her car payment and

---

[8]     See Coulston, 224 F.3d at 900 (noting that the ALJ had the opportunity to discredit the plaintiff's testimony regarding his misunderstanding of why the Administration sent him a benefit check to which he was not entitled, but the ALJ did not do so).

that she takes money out of savings during the summer months to cover the deficit in her income.[9] See Tr. at 15. Thus, it is unclear whether the ALJ took into account the entire financial picture when referring to Plaintiff's savings.

Furthermore, the question of whether Plaintiff can afford installment payments over time needs further consideration.[10] The ALJ found Plaintiff can repay the debt "on an installment basis," Tr. at 15, but he did not articulate the installment amount. The undersigned notes that each case cited by Defendant in which monthly installment repayments were allowed, either the installment payments were not at issue on appeal, or there was a specific dollar amount articulated, or both. See Martinez v. Astrue, No. 10-80723-CIV, 2011 WL 679851, at *5 (S.D. Fla. Feb. 1, 2011) (unpublished) (in affirming on other grounds, noting that a $400 repayment plan was in effect and the plaintiff was not facing any new reduction in income); Beebe v. Astrue, No. 07-CV-3960 (JFB), 2008 WL 5243890, at *9-11 (E.D.N.Y. Dec. 15, 2008) (unpublished) (affirming when "[t]he ALJ recommended that plaintiff repay the overpayment at a rate of $450.00 per month" because substantial evidence supported the ALJ's determination that recovery would not defeat the purpose of title II of the Act); Greenberg v. Comm'r of Soc. Sec., No. 3:95CV593(AWT),

---

[9] Defendant contends that because the Regulations require consideration of the "current" financial situation, the ALJ properly considered Plaintiff's savings, but he was not required to consider the fact that Plaintiff draws money from savings each month and in the summer to pay her expenses. Def.'s Mem. at 9. The undersigned disagrees. It is logical to conclude that if Plaintiff's expenses exceed her income and other resources must be used to cover the deficit each month, the "current" financial situation for Plaintiff at the time the Decision was rendered included the fact that each month, she draws money from savings to cover her expenses. Accordingly, the ALJ should have considered this information in determining whether the purpose of title II of the Act is defeated.

[10] The undersigned appreciates Plaintiff's argument that the ALJ could not consider whether Plaintiff could pay on an installment basis when determining whether to allow a waiver, but Plaintiff's technical argument likely has no practical effect given that the POMS specifically allows recovery on an installment basis.

1998 WL 229849, at *5-6 (D. Conn. Mar. 30, 1998) (unpublished) (when the ALJ "determined that although [the plaintiff's] expenses exceed his net income, they do not exceed his gross income and he has some savings," finding that the ALJ's determination would not defeat the purpose of the Act was supported by substantial evidence when the ALJ found that the plaintiff could repay at the rate of $50.00 per month).  Here, where Plaintiff's monthly expenses exceed her income and where Plaintiff's debt to the Administration is sizeable ($38,358.70), the finding that Plaintiff could afford installment payments, without more, is insufficient.  Judicial review is frustrated because the undersigned cannot tell whether the specific finding regarding Plaintiff's ability to pay "on an installment basis" is supported by substantial evidence.

In sum, on remand the Commissioner shall reconsider whether recovery of the overpayment defeats the purpose of title II of the Act.  In determining whether it does, the Commissioner shall articulate explicit and adequate reasons, supported by substantial evidence in the record, for the ultimate finding.  In addition, if the Commissioner is inclined to find that Plaintiff can repay on an installment basis, the Commissioner should include an amount that Plaintiff is able to pay.

## B.  Whether Recovery of the Overpayment Would be Against Equity and Good Conscience

The Regulations provide that recovery of an overpayment is against equity and good conscience if an individual "[c]hanged his or her position for the worse . . . or relinquished a valuable right . . . because of reliance upon a notice that a payment would be made or because of the overpayment itself[.]"  20 C.F.R. § 404.509(a)(1).  The Regulations also provide that if an individual accepts payment "because of reliance upon erroneous

information from an official source within the Social Security Administration . . . with respect to interpretation of a pertinent provision of the Social Security Act or regulations pertaining thereto," the individual is without fault, 20 C.F.R. § 404.510a, and in that specific instance, "adjustment or recovery will be waived since it will be deemed such adjustment or recovery is against equity and good conscience," 20 C.F.R. § 404.512(a).

Plaintiff contends the ALJ failed to address the issue of whether recovery is against equity and good conscience. Pl.'s Mem. at 16. Plaintiff argues this error alone requires reversal, id., but she also argues that recovery of the overpayment would indeed be against equity and good conscience because she relied on assertions and correspondence from the Administration in accepting payment, id. at 16-18. Specifically, Plaintiff contends the ALJ found that she "was not at fault in causing the overpayment because she clearly informed SSA that she returned to work, relied upon a Notice from the SSA that she was entitled to receive ongoing benefits . . . and continued to receive benefits after notifying SSA on numerous occasions that she was working." Id. at 17 (summarizing ALJ's findings at Tr. at 14). Plaintiff also relies on her own unchallenged testimony, in which she "noted that she was told by SSA that she was entitled to two separate trial work periods and later informed that she was entitled to receive disability benefits until she received confirmation from SSA that she was no longer entitled to benefits." Id. at 17-18.

Defendant concedes that "the ALJ did not specifically discuss the reasons for his finding" that recovery is not against equity and good conscience. Deft.'s Mem. at 12. As to Plaintiff's argument about reliance on erroneous information from the Administration,

-18-

Defendant contends "the ALJ did not specifically find she received or relied on misinformation." Id. at 14 (citation omitted).

If the ALJ's finding that Plaintiff was without fault was based upon Plaintiff's alleged reliance on erroneous information from the Administration in accepting the benefits, the ALJ was required to automatically deem recovery of the overpayment to be against equity and good conscience. See 20 C.F.R. §§ 404.510a, 404.512(a). Thus, it is necessary to take a look at the ALJ's "no fault" and "equity and good conscience" findings.

In finding Plaintiff "without fault in causing the overpayment," the ALJ recited the following:

> During the due process hearing, it was noted that the claimant's benefits started in 1992 and that the claimant worked a total of 8 months while in Germany in 1996 and 1997. She returned to work again in 2003. Her attorney stated that the claimant was told that she would have another trial work period of 9 months, so she returned to work during the 2003 to 2004 and 2004 to 2005 school years for the Duval County School System. The claimant noted that she again told Social Security that she was returning to work prior to August 2004. Her husband was taking care of the finances and the claimant again inquired about her Social Security payments. In April 2005, the claimant stated that SSA told her that the benefits would stop due to work. But th[en] she was sent a Notice of Change in Benefits on November 4, 2005, which shows that her benefits were increased. It was noted that SSA continued to pay her for another year afterward. She stated that her benefits were $1,960 and now only $850 due to the miscalculation by SSA.

Tr. at 14 (citation omitted). Even though the ALJ referred almost entirely to reliance by Plaintiff on representations by the Administration in discussing whether Plaintiff was at fault for the overpayment, the ALJ did not specifically state whether the no fault finding was based upon Plaintiff's reliance on erroneous information regarding her benefits and whether 20 C.F.R. § 404.510a was met. It was critical for the ALJ to do so in this instance, because

if that were the case, recovery of the overpayment would automatically deemed to be against equity and good conscience. <u>See</u> 20 C.F.R. § 404.512(a).

As to the ALJ's overall finding about whether recovery is against equity and good conscience, he did make the finding at the end of the Decision that it would not be, but he did not provide any reasons for the finding. Tr. at 15. Thus, remand is required for the Commissioner to do so and to explain his ultimate conclusion. <u>See</u> <u>Valente</u>, 733 F.2d at 1047 (reversing and remanding when "the ALJ found that requiring [the plaintiff] to refund the overpayments would not be against equity and good conscience but . . . stated no reasons for his conclusion").[11]

## VI.  Conclusion

For the reasons explained herein, it is

**ORDERED:**

1.    The Clerk of Court is directed to enter judgment pursuant to sentence four of 42 U.S.C. § 405(g) **REVERSING AND REMANDING** the Commissioner's final decision with instructions to (1) reconsider whether recovery of the overpayment defeats the purpose of title II of the Act consistent with the Court's Opinion and Order; (2) reconsider whether recovery of the overpayment is against equity and good conscience consistent with

---

[11]     In arguing that recovery would be against equity and good conscience, Plaintiff states she changed her position for the worse because of her reliance on the misinformation. Pl.'s Mem. at 17. Defendant contends that at the administrative level, Plaintiff "did not show, or even allege, that she took actions" which would be deemed to be sufficient to prove she changed her position for the worse. Deft.'s Mem. at 12-14. Given that the matter must be remanded for further consideration of the overall issue of whether recovery is against equity and good conscience, the Commissioner will have the opportunity to properly address Plaintiff's argument in this regard.

the Court's Opinion and Order; and (3) to take such other action as may be necessary to resolve this claim properly.

      2.     The Clerk is directed to close the file.

      **DONE AND ORDERED** at Jacksonville, Florida on February 10, 2012.

*James R. Klindt*
**JAMES R. KLINDT**
United States Magistrate Judge

kaw
Copies to:
Counsel of Record